**Revised October 19, 1998**

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 97-40841

_____


IN THE MATTER OF THE COMPLAINT OF LUHR BROS. INCORPORATED, as
Owner, Owner Pro Hac Vice, Operator and/or charterer of the M/V
The Admiral, in the Cause of Exoneration from and/or Limitation
of Liability, Civil and Maritime,

Plaintiff,

LUHR BROS. INCORPORATED,

Petitioner-Appellant,

VERSUS


BARRE SHEPP; WILLIAM COON; MATTHEW M. SHEPP, Estate of; AUDREY
JEROME; ALLEN JEROME, Estate of; CONNIE SUE VALVERDE,
Individually and as representative of the estate of Matthew
Marvin Shepp, deceased,

Claimants-Appellees.

-----------------------------------------------------------------

THE ESTATE OF ALLEN L. JEROME, OWNER OF THE F/V AUDREY, Praying
for Exoneration from or Limitation of Liability,

Plaintiff,

LUHR BROS. INCORPORATED,

Claimant-Appellant,

VERSUS


BARRE SHEPP; WILLIAM COON; CONNIE SUE VALVERDE, Individually and
as representative of the estate of Matthew Marvin Shepp,
deceased; MATTHEW M. SHEPP, Estate of,

Claimants-Appellees.

_____

September 30, 1998

Before WISDOM, KING, and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Following a bench trial in this maritime collision case, the district court denied Luhr Bros. Incorporated's Petition for Limitation of Liability and awarded the Claimants damages totaling $4,397,308.37. For the reasons that follow, we reverse and render.

## I.

### A.

This case arises out of a collision between the M/V THE ADMIRAL, a tugboat pushing a flotilla of six barges loaded with crushed rocks, and the F/V AUDREY, a shrimp boat carrying four people. Two passengers aboard the AUDREY, Allen L. Jerome and Matthew M. Shepp, died as a result of the collision. The parties present contrasting accounts as to how the collision occurred and who is responsible.

The following facts are not in dispute. THE ADMIRAL is a 2400 horsepower, twin screw, inland river tugboat owned and operated by Luhr Bros., Incorporated ("Luhr" or "Luhr Bros."). It is approximately 120 feet long and 35 feet wide. On the morning of April 20th, 1996, THE ADMIRAL received instructions to relieve the M/V THE ROBERT T., another tugboat operated by Luhr Bros. At the time, THE ROBERT T. was pushing six barges loaded with crushed

rock, made up two abreast and three long, through the Intracoastal Waterway. Each barge was 195 feet long and 35 feet wide. THE ADMIRAL relieved THE ROBERT T. and continued pushing the barges westbound along the Intracoastal Waterway, headed for Sergeant Beach, Texas, where the crushed rock was to be used in a coastal stabilization project. THE ADMIRAL proceeded to the intersection of the Neches River and the Sabine-Neches Canal, part of the Intracoastal Waterway.

The AUDREY, a shrimp boat owned by Allen L. Jerome, left the dock at the Rainbow Bridge near Orange, Texas at approximately 6:30 that morning. William Coon piloted the boat, with Connie Valverde, née Jones ("Connie Jones"), Matthew Shepp, Connie Jones's seven-year-old son, and Mr. Jerome as passengers. The group was taking a pleasure cruise and was planning to go fishing. The AUDREY left the dock and proceeded south down the Neches River towards the Intracoastal Waterway and Sabine Lake, their intended destination. THE ADMIRAL and the AUDREY met at the intersection of the Intracoastal Waterway and the Neches River. Captain Michael Coyle, at the helm of THE ADMIRAL, observed the AUDREY on his starboard, or right, side as he crossed through the intersection. The AUDREY entered the intersection and crossed behind the stern of THE ADMIRAL and its flotilla, which measured approximately 700 feet in total length. Both vessels then continued westbound down the Sabine-Neches Canal.

The AUDREY circled around and again passed under the stern of THE ADMIRAL, returning to the starboard side of THE ADMIRAL and her

3

tow.[1]  It is undisputed that the AUDREY eventually passed THE ADMIRAL on her starboard side, at least fifty to sixty feet from the tow.[2]  Both parties further agree that the AUDREY got as far as the stern of THE ADMIRAL's starboard lead barge.  The events from then until the collision are disputed.  The collision occurred around mile marker 277.  As a result of the collision, the AUDREY capsized and sank.  Both William Coon and Connie Jones were able to swim out from underneath the AUDREY and were rescued by other vessels.  Sadly, Allen Jerome and Matthew Shepp could not escape and both drowned.  It was later discovered that they had become entangled in shrimping gear, which prevented their escape.

The respective versions of the events leading up to the collision are widely divergent.  According to the AUDREY's version, Mr. Coon initially attempted to pass THE ADMIRAL and her flotilla

---

[1]  Although the barges in a flotilla such as THE ADMIRAL's are pushed rather than towed, they are nonetheless referred to as the "tow".

[2]  As the overtaking vessel, the AUDREY was subject to Inland Navigation Rule 13, 33 U.S.C. § 2013 (1994), which provides,

> (a) Overtaking vessel to keep out of the overtaken vessel's way
>> Notwithstanding anything contained in Rules 4 through 18, any vessel overtaking any other shall keep out of the way of the vessel being overtaken.
> . . .
> (d) Overtaking vessel to become crossing vessel only when finally past and clear
>> Any subsequent alteration of the bearing between the two vessels shall not make the overtaking vessel a crossing vessel within the meaning of these Rules or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear.

of barges on the port, or left, side.  Encountering rough and choppy seas, Mr. Coon decided to place the AUDREY on the starboard side of THE ADMIRAL and her barges, where the flotilla would block the wind and the water would be calmer.  Therefore, Mr. Coon turned the AUDREY to port to avoid THE ADMIRAL's wake, looped around, passed under THE ADMIRAL's stern, and moved down the starboard side of THE ADMIRAL.  As he approached and passed THE ADMIRAL, Mr. Coon made no attempt to contact the tugboat.

Mr. Coon testified that he intended to run alongside THE ADMIRAL and her flotilla until he reached the AUDREY's destination.  Consistent with this plan, he slowed the AUDREY as it reached the stern of the starboard lead barge and maintained this position.  According to Mr. Coon, the AUDREY traveled along the edge of the ship channel, approximately fifty yards from the starboard bank and fifty yards from THE ADMIRAL and her barges, which were on the AUDREY's port side.  Mr. Coon's testimony placed THE ADMIRAL approximately 100 yards (300 feet) from the bank, or roughly in the center of the shipping channel.  As the AUDREY came alongside THE ADMIRAL, Allen Jerome was working in the rear of the shrimp boat.  Thus, Mr. Jerome, Mr. Coon, and Connie Jones had unobstructed views of THE ADMIRAL.

According to both Mr. Coon and Connie Jones, the AUDREY maintained her course and speed and Mr. Coon never made a port turn towards or in front of THE ADMIRAL's tow.  Both testified that they looked over at THE ADMIRAL several times but never saw the gap between the barges and the AUDREY closing.  They also testified

5

that the first indication of danger was when the starboard lead barge in THE ADMIRAL's tow struck the port stern of the AUDREY, resulting in the AUDREY being spun around in front of THE ADMIRAL's tow. Immediately following this first collision, Mr. Coon pushed the AUDREY's throttle to full in an attempt to escape from the barges. However, his efforts proved futile as the AUDREY was struck again, this time by the port lead barge, causing the AUDREY to capsize and eventually sink.

THE ADMIRAL's account of the collision paints a vastly different picture. Captain Coyle testified that after passing through the intersection of the Neches River and the Intracoastal Waterway, he did not see the AUDREY again until he observed it attempting to pass on THE ADMIRAL's starboard side. Captain Coyle did not initiate any radio contact with the AUDREY. The AUDREY proceeded along the starboard side of THE ADMIRAL's tow and, according to Captain Coyle, the AUDREY maintained a constant speed of approximately five miles per hour faster than THE ADMIRAL and remained fifty to one hundred feet from the starboard side of THE ADMIRAL's tow.[3]

According to Captain Coyle, shortly after the AUDREY passed THE ADMIRAL's starboard lead barge, it made an abrupt turn to port and crossed approximately thirty feet in front of the bow of THE ADMIRAL's tow. At this point, Captain Coyle radioed his deckhand

_____

[3] Captain Coyle estimated that THE ADMIRAL and her tow were making roughly three miles per hour. In contrast to Captain Coyle's estimation of the AUDREY's speed, Mr. Coon testified that the AUDREY was proceeding at the same speed as THE ADMIRAL.

6

Robert Witt and told him that a boat was crossing the bow.  Captain Coyle also sounded a danger signal, shifted THE ADMIRAL's engines from full ahead to full astern (a process that takes approximately eighteen seconds to complete), and attempted to contact the AUDREY over the radio.  Unfortunately, at this point the collision was imminent and the bow of the port lead barge of THE ADMIRAL's tow struck the port side of the AUDREY amidships.  The AUDREY capsized, went underneath the bow of the barge, and popped up on the port side of the port lead barge.  When THE ADMIRAL and her tow finally came to a stop, the AUDREY was sinking in the middle of the channel some 200 to 300 feet behind THE ADMIRAL.

B.

Following the collision, Luhr Bros., as owner and operator of THE ADMIRAL, filed a limitation of liability proceeding pursuant to the Limitation of Vessel Owner's Liability Act, 46 App. U.S.C. §§ 181-196 (1994).  Allen Jerome's widow, Audrey Jerome, filed a separate limitation of liability petition on behalf of the estate of Allen Jerome, the owner of the AUDREY.  The court consolidated these actions.  Connie Jones and her former husband, Barre Shepp, filed claims against Luhr Bros. in both their individual capacities and as representatives of the estate of their deceased son, Matthew Shepp.  William Coon filed a claim against Luhr Bros. for personal injuries he sustained in the collision.  Finally, Audrey Jerome filed claims against Luhr Bros. in her individual capacity and as representative of the estate of Allen Jerome.  Following a two-day bench trial, the district court found THE ADMIRAL solely at fault

7

and adopted almost verbatim the Findings of Fact and Conclusions of Law proposed by the Claimants.

Additionally, the district court denied Luhr's Petition for Limitation of Liability and awarded the Claimants the following damages: $300,000.00 to the Estate of Matthew Shepp for damages sustained prior to his death; $500,000.00 to Barre Shepp for wrongful death damages; $1,525,535.81 to Connie Jones for medical expenses, personal injury damages, and wrongful death damages; $602,191.25 to William Coon for medical expenses and personal injury damages; $419,173.00 to the Estate of Allen Jerome for damage to the AUDREY, the cost of removing the AUDREY, funeral expenses, and damages sustained prior to his death; and $1,000,000.00 to Audrey Jerome for wrongful death damages. Including interest, the court awarded Claimants a total of $4,397,308.37. This appeal followed.

II.

A.

In reaching its conclusion that THE ADMIRAL was solely at fault in the collision with the AUDREY, the district court accepted almost entirely the version of events as related by William Coon and Connie Jones, and concluded that THE ADMIRAL allowed her tow to drift to the right side of the channel where it struck the AUDREY, pushing the AUDREY into the path of the barges.

The district court found that: (1) THE ADMIRAL's barges were only partially "made up" when THE ADMIRAL got underway and Captain Coyle was distracted by crew members working on the decks of the

8

barges; and (2) Captain Coyle was unaware of the heightened level of diligence compelled by the Coast Guard's requirement of permits for oversized tows.

The district court concluded that Captain Coyle and THE ADMIRAL violated several Inland Navigational Rules and related regulations including: (1) failure to obtain an oversized tow permit as required by 33 C.F.R. § 162.75(b)(5)(I) (1996); (2) failure to keep a proper lookout, in violation of Inland Navigational Rule 5, 33 U.S.C. § 2005; (3) failure to take proper evasive action when the risk of a collision became apparent, in violation of Inland Navigational Rule 8, 33 U.S.C. § 2008; (4) failure to keep track of THE ADMIRAL's position in relation to the AUDREY, in violation of Inland Navigational Rule 7, 33 U.S.C. § 2007; and (5) failure to sound a danger signal when the AUDREY's intentions were not clear, in violation of Inland Navigational Rule 34, 33 U.S.C. § 2034.

In denying limitation of liability to Luhr Bros., the district court found that Captain Coyle was "incompetent," and that his negligent conduct caused the collision with the AUDREY. Furthermore, the district court found that Luhr Bros. did not have any written policy or procedure for the "training, hiring, firing, review or to establish the qualifications of personnel who captain their vessels." According to the district court, this failure to supervise its captains adequately was a proximate cause of the accident, and this failure was within Luhr Bros.'s privity or knowledge, thus barring limitation of liability.

9

On appeal, Luhr Bros. makes a number of challenges to the Judgment entered against it. First, Luhr Bros. contends that the district court's determination of the cause of the collision was based upon findings of fact that are clearly erroneous. Before proceeding to the merits of Luhr Bros.'s argument, we pause to revisit the standards by which we review a challenge to the district court's factual findings.

B.

In <u>Anderson v. City of Bessemer City</u>, 470 U.S. 564, 105 S. Ct. 1504 (1985), the Supreme Court elucidated the standard of review contained in Federal Rule of Civil Procedure 52(a), which mandates that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." The Court set forth "certain general principles governing the exercise of the appellate court's power to overturn findings of a district court . . . ." <u>Anderson</u>, 470 U.S. at 573, 105 S. Ct. at 1511. Foremost among these principles

> is that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court.

<u>Id.</u> (alteration in original) (citation omitted) (quoting <u>United</u>

<u>States v. United States Gypsum Co.</u>, 333 U.S. 364, 395, 68 S. Ct. 525, 542 (1948)).  The appellate court must accept the district court's account of the evidence if it is plausible when viewed in light of the entire record.  Moreover, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  <u>Anderson</u>, 470 U.S. at 574, 105 S. Ct. at 1511; <u>see also</u> <u>Henderson v. Norfolk S. Corp.</u>, 55 F.3d 1066, 1069 (5th Cir. 1995).

The Court based this deference to the original finder of fact not only on the trial judge's expertise in fulfilling the role of factfinder and determining credibility, but also on the principle that a "[d]uplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources."  <u>Anderson</u>, 470 U.S. at 574-75, 105 S. Ct. at 1512.  As the Court succinctly stated, "the trial on the merits should be 'the "main event" . . . rather than a "tryout on the road."'"  <u>Id.</u> at 575, 105 S. Ct. at 1512 (alteration in original) (quoting <u>Wainwright v. Sykes</u>, 433 U.S. 72, 90, 97 S. Ct. 2497, 2508 (1977)).

The Court observed that Rule 52(a) requires greater deference to the trial court's findings when they are based upon determinations of credibility. Nevertheless, it cautioned against permitting a trial judge to insulate findings from review simply by denominating them credibility determinations.  <u>Anderson</u>, 470 U.S. at 575, 105 S. Ct. at 1512.  A witness's demeanor and inflection

11

are only two considerations the trial court must take into account when deciding whether to credit a witness's testimony. The court must also consider relevant documents or objective evidence that may contradict the witness's story and whether a witness's story is internally consistent and plausible on its face. Id.

In addition, in cases such as the instant one, where the district court's Findings of Fact and Conclusions of Law are near-verbatim recitals of the prevailing party's proposed findings and conclusions, with minimal revision, we should approach such findings with "caution." Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc., 73 F.3d 546, 574 (5th Cir. 1996). We may "take into account the District Court's lack of personal attention to factual findings in applying the clearly erroneous rule," Federal Deposit Insurance Corp. v. Texarkana National Bank, 874 F.2d 264, 267 (5th Cir. 1989) (quoting Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 258 (5th Cir. 1980)), and we "can feel slightly more confident in concluding that important evidence has been overlooked or inadequately considered when factual findings [are] not the product of personal analysis and determination by the trial judge." Amstar Corp., 615 F.2d at 258 (quoting James v. Stockham Valves & Fittings Co., 559 F.2d 310, 314 n.1 (5th Cir. 1977)).[4]

---

[4] Stricter appellate scrutiny of "rubber-stamped" findings by the district court is mandated in at least four other circuits. See, e.g., Cuthbertson v. Biggers Bros., Inc., 702 F.2d 454, 458-59 (4th Cir. 1983); Gimbel v. Commodity Futures Trading Comm'n, 872 F.2d 196, 199 (7th Cir. 1989); Alcock v. Small Bus. Admin., 50 F.3d 1456, 1459 n.2 (9th Cir. 1995); Ramey Constr. Co., Inc. v. Apache Tribe, 616 F.2d 464, 467 (10th Cir. 1980). The practice of "rubber-stamping" findings has been routinely discouraged. See,

12

The trial court's adoption of the prevailing parties' proposed findings, however, does not alter the bedrock principle that the findings may not be overturned on appeal absent clear error. Anderson, 470 U.S. at 572, 105 S. Ct. at 1510-11. As the Supreme Court has made clear, and as our cases have reinforced, on appellate review we owe great deference to the trial court's findings.[5] This is not to say, however, that we will never find clear error. When, after an examination of the entire evidence, we are "left with the definite and firm conviction that a mistake has been committed," clear error exists and it is our duty as the reviewing court to correct this mistake. Justiss Oil Co., Inc. v. Kerr-McGee Refining Corp., 75 F.3d 1057, 1062 (5th Cir. 1996) (citing United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 542 (1948)).

III.

A.

We structure our analysis around the factors that the Supreme Court cited in Anderson as potentially casting doubt upon the district court's credibility determinations, and therefore its findings. See Anderson, 470 U.S. at 575, 105 S. Ct. at 1512. In

_____

e.g., Anderson, 470 U.S. at 572, 105 S. Ct. at 1510-11; Gimbel, 872 F.2d at 199; Amstar Corp., 615 F.2d at 258.

[5] See, e.g., Amadeo v. Zant, 486 U.S. 214, 223, 108 S. Ct. 1771, 1777 (1988) ("clearly-erroneous standard of review is a deferential one"); Anderson, 470 U.S. at 573-75, 105 S. Ct. at 1504, 1511-12; In re Port Arthur Towing Co., 42 F.3d 312, 318-19 (5th Cir. 1995); Sockwell v. Phelps, 20 F.3d 187, 190 (5th Cir. 1994).

13

this case, these interrelated factors include: (1) the physical evidence presented at trial; (2) the expert testimony analyzing such evidence; (3) the testimony of independent witnesses; and (4) the plausibility and internal consistency of the AUDREY's version of events.

### 1. The Physical Evidence

The physical evidence collected after the collision conflicts with the AUDREY's version of events. This evidence includes the damage sustained by the barges and the AUDREY and the location of the sunken AUDREY.

Daniel Carter and John Stickling, Jr., who independently inspected THE ADMIRAL's six barges following the accident, testified as to the damage that the barges had incurred.[6] Their task was to examine the AUDREY and the two lead barges--the M-8005 and the M-878--to determine whether evidence existed of a collision between either of those barges and the AUDREY. As mentioned above, according to the AUDREY, there were two points of impact with THE ADMIRAL's barges, the first with the starboard lead barge, the M-878, and the second with the port lead barge, the M-8005.

In contrast to the AUDREY's version, the only evidence of fresh or new contact on either barge was found on the port side of the bow of the M-8005 barge, consistent with THE ADMIRAL's account. Two horizontal scrapes of paint, a white scrape at the top and a

---

[6] Mr. Carter conducted his survey approximately two hours after the collision. Mr. Stickling conducted his survey roughly two weeks later.

14

blue scrape at the bottom, ran along the port edge of the M-8005's bow. These scrapes matched the color scheme of the AUDREY. Neither surveyor found any evidence of a recent impact on the M-878, the starboard lead barge. Similarly, the AUDREY only exhibited damage to the port side amidships, consistent with one impact with the bow of the M-8005 barge.

To explain the lack of physical damage to the AUDREY from the first alleged impact, both Mr. Coon and Captain Underhill, an expert witness for the Claimants, cited a rubber tire fender as responsible for preventing any damage to the rear port quarter of the AUDREY or the starboard bow of the M-878. It is implausible, however, that a collision of the force needed to spin and push the AUDREY in the manner that Mr. Coon alleged, even if cushioned by a rubber tire, would leave no marks--not even tire marks--on either the AUDREY or the M-878 barge.

Furthermore, the location of the sunken AUDREY does not square with the AUDREY's version of the accident. According to the AUDREY's version of the collision, THE ADMIRAL drifted or angled towards the starboard bank where it struck the AUDREY at a point close to the edge of the shipping channel, approximately 100 to 150 feet from the north bank. The AUDREY eventually sank approximately 70 feet south of this point, after it had been thrust across the entire width of the barge flotilla. Had the collision occurred in this manner, we would expect to find the sunken AUDREY approximately 170 to 220 feet away from the north bank. The Corps of Engineers' survey, however, revealed that the AUDREY was raised

from a point south of the center of the channel, at least 300 feet from the north bank.

It is true that the AUDREY did not sink immediately, and thus theoretically could have drifted farther (south) into the channel. However, all trial testimony indicated that both wind and tide were pushing towards the north bank. Thus, to the extent that the AUDREY moved as it sank, it would have moved to the north, not the south. Again, this supports THE ADMIRAL's version of the events. Moreover, those advocating the AUDREY's version provided no evidence or argument to explain the location of the sunken AUDREY.

In sum, the physical evidence strongly supports THE ADMIRAL's version of events--a single collision taking place near the middle of the channel with a single point of impact between the port side of the AUDREY and the port bow of the port lead barge.

## 2. Expert Witnesses

The district court also had before it expert witness testimony interpreting the physical evidence and analyzing the movements of the two vessels. Captain R.J. Underhill testified for the Claimants, and Donald Green testified for Luhr Bros.

Captain Underhill, a marine surveyor, testified as an expert witness to, among other things, the AUDREY's version of the collision. He theorized during his deposition and on direct examination that THE ADMIRAL had canted or angled fifteen degrees across the channel and had struck the AUDREY, which had been running parallel to the front of the lead starboard barge. On cross-examination, after his version of events was challenged by

16

Luhr's counsel, he altered his opinion, stating that THE ADMIRAL did not angle or cant, but instead remained almost parallel to the bank and was set into the AUDREY by the current.[7] His testimony was based almost exclusively on Mr. Coon's explanation of the collision.[8] He did not attempt to support the AUDREY's version of the events with an explanation of the physical evidence or other scientific analysis.

This is in contrast to the expert testimony provided by Luhr Bros. One of Luhr's experts, Donald Green, operates a marine school that specializes in preparing candidates for Coast Guard examinations and training boat captains for licenses and radar endorsements required by the Coast Guard. He is a retired Coast Guard commander who spent twenty-three years in the Coast Guard, five and one-half of those years as an investigator. Mr. Green reviewed depositions, surveyors' reports describing the physical evidence, the Coast Guard post-accident report, charts, vessel logs, and other relevant information. He also spoke to a witness and attempted to recreate the collision on a computer. Based upon his investigation, Mr. Green believed that the AUDREY had attempted to pass in front of THE ADMIRAL's tow. During his trial testimony and accompanying video presentation, Mr. Green analyzed a number of

---

[7] It is this explanation of the events--THE ADMIRAL drifted to starboard--that the district court adopted in its findings.

[8] Even so, as we explain in more detail later, Captain Underhill was forced to admit that his understanding of the mechanics of the collision was not consistent with Mr. Coon's testimony. See Section III.A.4.

17

possible versions of the collision, confirming his opinion that the AUDREY was at fault in the collision.[9]

### 3. Independent Witnesses

In addition to the testimony of Mr. Coon, Ms. Jones, and Captain Coyle, the district court heard from witnesses, with no connection to any party, whose testimony was inconsistent with the AUDREY's account of the collision.

Captain Joe Holloway was the relief captain aboard the M/V CITY OF PORT ALLEN. On the morning of the collision he was proceeding west, trailing THE ADMIRAL by approximately one-quarter to one-half mile. He testified that he twice contacted THE ADMIRAL to arrange for his vessel to overtake THE ADMIRAL. On the second request, Captain Coyle advised Captain Holloway not to pass because a shrimp boat had pulled in front of THE ADMIRAL's tow and he was backing THE ADMIRAL down. Captain Holloway testified that for the entire time that he observed THE ADMIRAL, it remained near the center of the channel, consistent with THE ADMIRAL's version of events. This testimony contradicts Mr Coon's testimony and Captain Underhill's theory that THE ADMIRAL moved to starboard and struck the AUDREY near the north bank.[10]

---

[9] Oddly, the trial judge made no mention of Mr. Green's testimony in his findings. At trial, counsel for the Claimants complained of Mr. Green's failure to consider Ms. Jones's account of the collision in rendering an opinion of the cause of the accident. However, because Ms. Jones's testimony was almost identical to Mr. Coon's testimony, we are not persuaded that this omission bears in any way upon the validity of Mr. Green's opinion.

[10] Curiously, similar to Donald Green's testimony, the district court did not mention Captain Holloway or his testimony in

18

In contrast to Luhr Bros., the Claimants presented no independent fact witnesses supporting their theory of the collision. The Claimants did offer the deposition of Robert Witt, a deckhand aboard THE ADMIRAL, in an attempt to discredit Captain Coyle's story. Mr. Witt's deposition testimony, however, is generally consistent with the version offered by THE ADMIRAL. Specifically, Mr. Witt testified that he was working on the starboard side of the tow when he observed the AUDREY pass approximately 100 feet off the starboard beam. Shortly thereafter, Captain Coyle called Mr. Witt over the radio to report that a boat was crossing his bow, and Captain Coyle began to blow the danger signal. Mr. Witt immediately looked towards the bow, where he observed the AUDREY crossing the bow of the tow. A second or two later, the AUDREY disappeared behind the rocks piled on the barges, and Mr. Witt began to move to the port side of the tow. As he moved to the port side, he caught a glimpse of the AUDREY from the middle of the barges between the rock piles. Mr. Witt next saw the AUDREY bottom up, coming down the port side of THE ADMIRAL's tow. Thus, Mr. Witt's testimony is consistent with Captain Coyle's version of the accident: the AUDREY cut across the bow of THE

its findings.

The only independent witness that the district court did mention was Captain Jimmy Lewis, whom Luhr Bros. had presented as a witness to the collision. Captain Lewis was piloting a tugboat that had been approaching THE ADMIRAL head-on. His testimony was generally consistent with THE ADMIRAL's account of the collision. The district court declined to credit Captain Lewis's testimony because of inconsistencies between his trial testimony and his earlier deposition testimony. A review of the record indicates that the district court was justified in so doing.

19

ADMIRAL's tow and the port lead barge collided with the AUDREY near the middle of the channel.

### 4. Implausibility

Finally, we are struck with the facial implausibility of the AUDREY's version of the collision.

Mr. Coon testified that he proceeded to pass THE ADMIRAL's flotilla on its starboard side, approximately 150 feet from the barges. He stated that when he drew even with the stern of the starboard lead barge and the bow of the starboard middle barge, he slowed to the same speed as THE ADMIRAL's flotilla and held this position relative to the barges. Ms. Jones supported this account. However, as Captain Underhill was forced to concede, the collision could not physically have occurred with the AUDREY and THE ADMIRAL's tow in this relative position as testified to by Mr. Coon and Ms. Jones.[11] It was critical to the AUDREY's version of the collision that the AUDREY collided with the <u>bow</u> of THE ADMIRAL's starboard lead barge, rather than some other part of the starboard side of the flotilla. Otherwise the AUDREY could not explain how she was thrust across the bow of the starboard lead barge and collided with the bow of the port lead barge.

Furthermore, it is implausible that not one person aboard the AUDREY saw THE ADMIRAL's tow--piled with rock sitting twelve to

---

[11] Captain Underhill was faced with the task of explaining the mechanics of the collision, using Mr. Coon's description of the events. Captain Underhill was unable to do so and stated that Mr. Coon's explanation of the events was "impossible." Captain Underhill then offered his own version of what took place.

20

fifteen feet out of the water--slowly drifting toward the AUDREY. Yet the AUDREY's witnesses maintained that they had no warning of impending danger until the impact.

Mr. Coon testified as follows:

Q:   And you've [sic] navigating with that depth finder and you're looking straight ahead, right?
A:   [by Mr. Coon] Right.
Q:   You never look over here again, do you?  You never saw that tow coming, did you?
A:   I looked over there several times.
Q:   Every time you looked over there, that tow still looked like it was 50 yards away.
A:   Every time I looked over there, that tow looked just exactly like it was the first time I looked at it.
Q:   Which is 50 yards away?
A:   Right.
. . .
Q:   Did you see the tow coming, sir?
A:   No, sir.
Q:   Why not?
A:   I don't know why.  I really don't know why I never seen [sic] it coming.

Ms. Jones testified similarly:

Q:   Now, no one -- you said nobody said anything or nobody in the boat ever discussed anything prior to the collision about "the positions of the vessels are closing," "we need to look out," "look out! Something is coming!"  Nothing like that was ever said.
A:   [by Ms. Jones] No, sir.
Q:   And nobody on the AUDREY, to your knowledge, was aware that this tow was drifting to the starboard side?
A:   No, sir.
Q:   And the only thing you know is that you got hit, and that's the first indication you or anyone else on that boat had that this [sic] six loaded barges had come starboard towards your boat?
A:   That's correct.

Mr. Coon also testified that prior to the collision, Mr. Jerome was working at the back of the boat, with a completely

21

unobstructed view behind the AUDREY and to its port and starboard sides. According to Mr. Coon's testimony, Mr. Jerome gave no indication that he noticed THE ADMIRAL's barges closing in on the AUDREY. Moreover, Captain Underhill stated that Mr. Coon and Ms. Jones stood in the best position to maintain a proper lookout. Given these circumstances, we find it implausible that THE ADMIRAL drifted to starboard, and that not one person aboard the AUDREY realized that this ten- to twelve-foot-high wall of crushed rock was on a collision course with the AUDREY until THE ADMIRAL's barge struck the AUDREY. Rather, THE ADMIRAL's version that no collision occurred until the AUDREY crossed the bow of the flotilla is much more plausible.

In view of the sheer implausibility of the AUDREY's account of the collision, the district court committed clear error in accepting this version of the accident.

### B.

Based upon the foregoing discussion, we are left with the definite and firm conviction that the physical evidence, the testimony of independent witnesses, and the inconsistency and implausibility of the AUDREY's version of the collision demonstrate that the district court erred in finding THE ADMIRAL solely at fault for this collision. The only evidence to support such a finding is the eyewitness testimony of Mr. Coon and Ms. Jones. Captain Underhill's testimony, apart from being inconsistent with that of Mr. Coon, is unsupported by the physical evidence and adds no support to Claimant's case. Opposed to that testimony is the

22

testimony of Captains Coyle and Holloway, as well as deckhand Robert Witt's testimony, the physical evidence, and the expert testimony interpreting that physical evidence.  The overwhelming weight of credible evidence establishes that the AUDREY, for whatever reason, attempted to cross the bow of THE ADMIRAL's tow and was unsuccessful, resulting in a single impact at the bow of the port lead barge.  Mr. Coon's actions in proceeding across the bow of THE ADMIRAL, thereby placing the AUDREY *in extremis*, were the sole cause of this collision.

Because we agree with Luhr's principal argument on appeal-- that the district court committed clear error--we need not address Luhr's remaining arguments challenging the district court's refusal to allow Luhr to limit its liability, the court's valuation of THE ADMIRAL for limitation purposes, and the basis and quantum of the Claimants' damages awards.

IV.

We are ever mindful of our limited role as an appellate court. A corollary to this awareness is the deference given to a district court's factual findings by way of clear error review.  However, for the reasons stated above, we are convinced that the district court clearly erred.  Because we conclude that the action of the AUDREY was the sole proximate cause of this collision, we REVERSE the judgment rendered against THE ADMIRAL, and RENDER a take nothing judgment against the Claimants.

REVERSED and RENDERED.